Oscar N. Pinkas
Sara A. Hoffman
**GREENBERG TRAURIG, LLP**
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9214
Facsimile: (212) 801-6400

Ari Newman (*pro hac vice* pending)
**GREENBERG TRAURIG, PA**
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **A.B.C. CARPET CO., INC.,** *et al.*,[1] | **Case No. 21-11591 (DSJ)** |
| **Debtors.** | **(Joint Administration Requested)** |

### DECLARATION OF AARON ROSE PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Aaron R. Rose, make this declaration under 28 U.S.C. § 1746:

1.     I am the Chief Executive Officer of each of the above-captioned debtors and debtors

in possession (each a "**Debtor**" and together, the "**Debtors**" or the "**Company**"), which do

business as abc carpet & home.  I have served in that role since May of 2019.  In that role, I am

familiar with the Debtors' day-to-day operations, business and financial affairs books and records,

---

[1]   The Debtors in these chapter 11 cases (the "**Chapter 11 Cases**"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  A.B.C. Carpet Co., Inc. (6537), A.B.C. Home Furnishings, Inc. (6915), and A.B.C. Oriental Carpets, Inc. (3679).  The Debtors' principal place of business is 888 Broadway, New York, New York 10003.

and the circumstances leading to the commencement of the Debtors' above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      As Chief Executive Officer, I oversee and am responsible for the operations of the Debtors.  Prior to joining the Debtors, I held leadership roles at a number of retail companies, including J. Crew Group, Williams-Sonoma Inc, and Euromarket Designs (dba Crate & Barrel and cb2) among others.

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**").

4.      To enable the Debtors to operate effectively and minimize potential adverse effects in the Chapter 11 Cases, the Debtors have requested certain relief in "first day" motions and applications filed with the Court (collectively, the "**First Day Motions**") concurrently herewith. The First Day Motions, summarized below, seek, among other things, to (a) ensure the continuation of the Debtors' cash management system and other business operations without interruption, (b) allow the Debtors to incur secured indebtedness and use cash collateral, (c) preserve the Debtors' valuable relationships with customers, (d) maintain employee morale and confidence, and (e) implement certain administrative procedures that will promote a seamless transition into chapter 11.  The relief requested in the First Day Motions is critical to the Debtors' efforts to maximize value for the benefit of their creditors.

5.      I submit this Declaration in support of the First Day Motions.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the retail industry.  I am authorized to submit this Declaration on the Debtors' behalf.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.      This Declaration is intended to provide an overview of the Debtors' business and their need to commence the Chapter 11 Cases.  Section I sets forth certain relevant background.  Section II provides a brief overview of the Debtors' business operations and workforce.  Section III describes the Debtors' prepetition capital structure and debt obligations.  Section IV describes certain circumstances that precipitated commencement of the Chapter 11 Cases and the Debtors' objectives in the Chapter 11 Cases.  Section V provides a summary of the First Day Motions and the factual bases supporting the relief requested therein.  Finally, section VI provides additional information required by the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**").

## I.      OVERVIEW[2]

7.      The Debtors own and operate abc carpet & home, an iconic lifestyle brand and home furnishing retailer with stores in Manhattan and Brooklyn.  Founded in the late nineteenth century as a pushcart business selling carpets in lower Manhattan, the Company grew to over 250 employees and boasts one of the largest and most diverse rug and home collections in the world.

---

[2]   Capitalized terms used, but not defined in this Overview shall have the meaning ascribed to those terms as set forth below.

8.      Under the stewardship of Paulette Cole ("**Ms. Cole**"),[3] whose great-grandfather established the rug business that grew into abc carpet & home, the Company transformed from a neighborhood home furnishings store into a New York destination, and began to focus more on sustainable design, artistic visual merchandising and ethical sourcing.  The Company's flagship store located at 888 Broadway in New York's Flatiron District offers customers a unique experiential marketplace.

9.      The Debtors' business operations have been severely impacted by the pandemic, including government mandated store closures, fulfillment issues due to supply chain shortages, production delays, and delays in return to work for nearby commercial office spaces.  The impact of the pandemic on abc carpet & home was more pronounced than many other retailers given that the Company's flagship store is in New York City, which was the subject of not only more restrictive regulations than many other municipalities, but also experienced a mass exodus of current and prospective customers leaving the city.

10.     In addition, the Debtors' business has been negatively impacted for the past few years by other adverse market trends, including the shifting of sales from traditional brick-and-mortar retailers to online retailers, changing consumer preferences and construction delay related impact to operating performance at the 888 Broadway store location.  From January 1, 2021 through July 31, 2021, the Company generated revenue of $25.46 million and negative EBITDA of $9.215 million.  By contrast, through the same period in 2017, the Company generated $59.1 million in revenue.

---

[3]    Ms. Cole is the Debtors' controlling equity holders and served as the Debtors' CEO from 2003 to 2019.  She currently serves as the Debtors' Creative Director and a member of their boards of directors.

11.     Prior to the COVID-19 pandemic, the Debtors were intent on implementing certain transformational changes to enhance the business and return operating revenues to levels achieved in 2017 (over $100 million in revenue) and years prior.  The Debtors retained B. Riley Securities, Inc. ("**B. Riley**"), in April 2020 to locate a buyer or potential investor willing to implement these transformational changes, but the impact of the pandemic at that time made sourcing investment or finding a buyer for a New York City-based retailer challenging.   Despite the difficult environment, B. Riley helped the Company secure $5 million in secured financing from Gerber Finance, Inc. ("**Gerber**") in October 2020.

12.     Despite the additional financing, the Company continued to feel the combined strain of the pandemic and related closures, and other adverse market trends, and began to experience severe liquidity constraints.  In or around July 2021, the Debtors again retained B. Riley and Greenberg Traurig, LLP ("**GT**") to evaluate and develop strategic alternatives to address the Company's financial distress and severe liquidity issues.

13.     In connection with the Company's efforts to identify a prospective strategic partner, 888 Capital Partners, LLP ("**888 Capital**") expressed an interest in purchasing substantially all of the assets of the Debtors.  To advance that interest, 888 Capital acquired and took assignment of the Debtors' senior secured credit facility in early August 2021 and advanced additional funds to the Debtors under that facility to enable the Company to continue operations.  The Debtors understand that 888 Capital is controlled by Regal Investments LLC and that Ms. Cole has a minority interest in 888 Capital.

14.     On September 8, 2021, the Debtors and 888 Capital entered into a Stalking Horse Asset Purchase Agreement ("**Stalking Horse APA**") through which 888 Capital seeks to purchase substantially all of the assets of the Debtors.  Contemporaneously with the entry into the Stalking

Horse APA, 888 Capital has also agreed to provide the Debtors with debtor-in-possession financing, so that the Debtors have the liquidity necessary to file Chapter 11 and consummate a value-maximizing transaction. The Debtors believe that the chapter 11 process described in this Declaration and in contemporaneous filings is in the best interests of all stakeholders and will maximize recovery to the Debtors' creditors.

## II.    THE DEBTORS' BUSINESS

### a.    History and Formation

#### i.    *Humble Beginnings*

15.    The Company traces its beginning to 1897, when Ms. Cole' great-grandfather sold rug with a pushcart through Manhattan's Lower East Side. Ms. Cole's grandfather later opened a store at East 29th Street, and in 1961 moved the carpet and rug establishment to two floors on 881 Broadway, at East 19th Street.

16.    In 1979, Ms. Cole's father expanded the enterprise by purchasing Schumacher's area rugs, which added more than 500,000 square feet of rugs to the company's stock. In 1980, the Company rented the basement and first floor directly across the street from 881 Broadway at 888 Broadway.

#### ii.    *Period of Growth*

17.    In 1983, with the influence of Ms. Cole, the Company expanded beyond floor coverings into the broader field of home furnishings. Ms. Cole's vision for the Company transformed the operation from a carpeting retailer into a chic home furnishings emporium that now included antiques and accessories. The Company cultivated relationships with craftspeople and designers around the world. The Company's carpet division also became the nation's largest single-store floor coverings operation, with annual sales of $60 million by 1988.

18.    As the home furnishings business expanded, half of the Company's sales were coming from home furnishings by 1993.  The Company had around 350,000 square feet of retail space, which included leased departments, from boutiques by Ralph Lauren and Estee Lauder's Origins to an area for state-of-the-art consumer electronics.

19.    During the 1990s and into the early 2000s the Company continued to expand by opening stores in Delray Beach, Florida and Harrods in London.  The Company also conducted road shows in different cities and formed a joint venture to sell home furnishings to retailers, among other business initiatives.

*iii.*    *ABC Restaurants*

20.    Over the years, Debtor ABC Home Furnishings, Inc. ("**Home**") owned and operated multiple restaurants within the flagship store.   In the 2010s, Home entered into agreements with renowned chef Jean-Georges Vongerichten to manage and operate three restaurants at that location (the "**Restaurants**").  In November 2019, Home entered into a Business Purchase Agreement with ABC Kitchen(s), LLC ("**Kitchen(s)**") to sell the Restaurants to Kitchen(s), an entity affiliated with Ms. Cole, for $5,263,000.  The parties closed on the Business Purchase Agreement in December 2019.  Kitchen(s) is not a debtor in the Chapter 11 Cases and the Restaurants are not assets of the Debtors' bankruptcy estates.

*iv.*    *Rightsizing Operations*

21.    As the Company continued to focus almost exclusively on being an experiential marketplace, however, the retail world was transitioning to focus on digital marketing and e-commerce, and the Company began to fall out of step.  In the 2010s, the Company began right-sizing its operations and closed several locations, including its outlet location in Delray Beach, a warehouse in the Bronx and the 30-year old carpet location at 881 Broadway.

22.     Since joining the Company as CEO, I have been advancing initiatives to bring the Company into the digital age and make the store more accessible while retaining its brand essence and experiential retail leadership.

**B.      Corporate Structure**

23.     The Company is a family-owned business that was operated by Ms. Cole from 2003 until I joined in 2019.  Ms. Cole, along with various trusts maintained for the benefit of Ms. Cole and/or her daughter, own directly or indirectly each of the Debtors.

24.     The governing board of each of the Debtors (collectively, the "**Boards**") is currently comprised of Ms. Cole, Deirdre O'Connor—an independent director whom I selected and who was appointed to the Boards in July 2021—and me.  Each of the Debtors' Boards has delegated to Ms. O'Connor and me, authority with respect to matters related to the Debtors' bankruptcy filing, any sale process and restructuring.

**C.      The Debtors' Business Operations**

25.     The Debtors' own and operate the iconic home furnishings store and brand, abc carpet & home.  The majority of the Debtors' revenues are derived from sales made from the Company's landmark store at 888 Broadway.  At that location, the Debtors operate both their carpet and rug operation and also the home furnishing business, which includes leased departments.  The Company also operates an outlet store in Brooklyn, has warehouses in Long Island City and New Jersey, and sells merchandise through its website: abchome.com.

26.     The Company occupies a unique position in the market at the apex of socially conscious, inspired living, quality and modern home furnishings and floor coverings.  Customers come to abc carpet & home for something inspiring and meaningful, and vendors from the around the world share the Company's values and vision.  Designers and interior decorators have deep

ties to the Company and are offered professional discounts to further cultivate these mutually beneficial relationships. The flagship store also includes a variety of hand-selected and curated leased departments, which enhance the customer experience and the Company's business performance. abc carpet & home is an iconic brand that resonates within New York City and beyond and its storied location in the Flatiron District is an indelible mark on the New York City landscape.

27.     The Debtors historically maintained a supply chain comprised of more than 1,000 vendors designed to ensure the uninterrupted flow of new merchandise to their brick-and-mortar locations and to their e-commerce customers. The Debtors' greatest expense has been its merchandise, on which the Debtors historically have spent approximately $30 million annually. The Debtors do not manufacture any merchandise, and have relied upon their vendors to ensure a continuous supply of goods to their customers.

**D.     Employees**

28.     As of the Petition Date, the Debtors employ approximately 152 employees, of which approximately 83 are salaried and approximately 69 are hourly (collectively, the "**Employees**"). The vast majority of Employees work in or support the Debtors' stores, while smaller groups work in the Debtors' warehouses.

29.     As of the Petition Date, approximately 36 Employees are represented by a union. The Debtors are party to a collective bargaining agreement (the "**CBA**") with Local 810 (International Brotherhood of Teamsters), which represents all of the Debtors' unionized Employees.

30.     Given the Debtors' constrained liquidity and desire to continue as a going concern and maintain as many jobs as possible, the Debtors were forced to implement significant workforce reductions immediately prior to bankruptcy.

**E.      Lease Disputes at 888 Broadway and the Amma421 LLC Bankruptcy**

31.     In 2017, entities affiliated with the Debtors sold several floors at 880-888 Broadway and the attendant and adjacent leaseholds—including some floors of the Company's flagship store—to entities owned or controlled Normandy Real Estate Partners, which was later acquired by Columbia Property Trust (the "**Master Landlord**").

32.     As a result, the Debtors' main store at 880-888 Broadway, which flows into spaces in the adjacent building, occupies various floors owned and leased by different landlords, some of which are affiliates of the Debtors.  More specifically, the Debtors are party to both a sub-lease and sub-sublease under which a Debtor is a sub-tenant or sub-subtenant (and an affiliate of) Amma421 LLC ("**Amma**"), the sub-landlord or sub-sublandlord.  Amma is owned by Ms. Cole. The Master Landlord is the ultimate landlord in connection with the Debtors' sub-lease and sub-sublease with Amma (collectively, with the sub-leases, the "**Normandy Leases**").

33.     Various disputes arose between Amma and the Master Landlord regarding certain construction work that was performed by the Master Landlord, including the date by which the work was to be completed and was actually completed.  The Master Landlord's conduct and delayed construction directly impacted operations at, and accessibility to, the Company's flagship store.

34.     The Master Landlord sent rent demand letters and notices of default under the Normandy Leases to Amma.  By Notice of Termination dated July 14, 2021, the Master Landlord purported to terminate the Normandy Leases effective as of July 22, 2021.  In order to obtain a

stay of the effect of the alleged termination of the Normandy Leases, Amma filed a voluntary

petition for Chapter 11 relief with this Court on July 21, 2021, commencing Case No. 21-11333-

DSJ ("**Amma Bankruptcy Case**").  More details regarding Amma's disputes with the Master

Landlord are set forth in the *Declaration of Paulette Cole Pursuant to Local Bankruptcy Rule*

*1007-2* filed in the Amma Bankruptcy Case.

35.    The Debtors allegedly owe approximately $3.5 million in back "rent" to Amma

concerning the construction disputes, subject to any claims, rights of setoff and other defenses.

### III.    CAPITAL STRUCTURE

36.    As set forth below, as of the Petition Date, the Debtors are subject to asserted

outstanding funded debt obligations consisting of (i) approximately $8 million in senior lien

secured debt outstanding under the Gerber Facility (as defined below); (ii) approximately

$15 million in unsecured loans from Northern Trust; and (iii) approximately $40 million in

unsecured insider loans.

a.    **Secured Debt**

37.    On October 1, 2020, Debtors executed a certain Promissory Note and Loan and

Security Agreement together with all other agreements, documents, security agreements, notes,

Uniform Commercial Code financing statements, and instruments executed and/or delivered in

connection therewith or related thereto in favor of Gerber, predecessor in interest to 888 Capital,

as lender (in such capacity, the "**Prepetition Lender**") to provide Debtors with one or more loans

(the "**Prepetition Loan**") in the principal amount of $5,000,000.00.   Various amendments,

including that certain Forbearance Agreement and Amendment to Loan and Security Agreement

dated February 26, 2021; Amendment to Loan and Security Agreement and Pledge Agreement

dated as of March 19, 2021; Second Amendment to Loan and Security Agreement and Pledge

Agreement dated as of April [____][sic], 2021; Amendment to Loan and Security Agreement and Forbearance Agreement dated July 21, 2021; the Amendment and Modification dated August 16, 2021; and the Amendment and Modification dated September 1, 2021 were subsequently entered into pursuant to which the Prepetition Lender made certain financial accommodations to Debtors.

38.     In connection with the Prepetition Loan, Ms. Cole executed a Guaranty dated as of October 1, 2020 pursuant to which she guaranteed the payment of certain of the Obligations of Debtors to Prepetition Lender (as amended, modified, supplemented or restated, the "**Guaranty Agreement**"), and in March 2021 pledged as collateral her right, title and interest in and to a deposit account in her name.

39.     On July 21, 2021, the Prepetition Lender and Ms. Cole executed a Participation Agreement, pursuant to which Ms. Cole acquired a $2,000,000 undivided junior participation interest under the Prepetition Loan Documents (the "**Participation Agreement**").  On August 4, 2021, the Prepetition Lender and Ms. Cole executed a Partial Release of Collateral, also lent to the Company under the Prepetition Loan, pursuant to which Ms. Cole acquired an additional $700,000 undivided junior participation interest under the Prepetition Loan Documents (the "**Release Agreement**" and together with the Participation Agreement, the "**Participation Documents**" and Ms. Cole's interest under the Prepetition Loan Documents, the "**Participation Interest**").

40.     The Prepetition Loan is secured by a first priority security interest in substantially all assets of the Debtors in which Prepetition Lender properly perfected a security interest (as described in the Prepetition Loan Documents, the "**Prepetition Collateral**").

41.     The Prepetition Loan matures on September 30, 2022 and bears interest at the rate of three percent (3%) per annum in excess of the prime rate plus five percent (5%) in the case of a default.  As of the Petition Date, the outstanding balance due on the Prepetition Loan (including

recent prepetition advances) was no less than $8 million (the "**Prepetition Secured Obligations**"), of which no less than $2.7 million constitutes Ms. Cole's Participation Interest under the Participation Documents, including interest.

### B. Unsecured Debt

42.     As of the Petition Date, general unsecured claims against the Debtors are estimated to be in excess of $80 million.  Unsecured claims against the Debtors include (a) unsecured insider loans from Ms. Cole and her family totaling more than $40 million, (b) non-insider loans from Northern Trust totaling more than $15 million, (c) trade and other unsecured debt incurred in the ordinary course of the Debtors' business, (d) amounts owed to the Debtors' vendors, and (e) rent and other obligations under the Debtors' real property leases.

## IV.   THE NEED FOR CHAPTER 11 RELIEF AND THE EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### a. Diminished Operating Performance

43.     Despite the Company's unique position in the marketplace, the last few years have been increasingly challenging.  The Company's operating performance has been in a steady decline and has relied in several instances on Ms. Cole to advance loans to the Company to avoid liquidity shortfalls and operational challenges.

44.     The diminishing operating performance is the result of a confluence of events that have been exacerbated by the COVID-19 pandemic.  Those events have included a slow transition to digital marketing and e-commerce, liquidity shortfalls created by increasing costs and declining revenues, and construction issues that impacted operations, all of which were then magnified by the brick and mortar shock caused by the pandemic.  The pandemic not only resulted in significantly reduced foot-traffic in the landmark store—a location designed to be an experiential marketplace—it also caused supply chain shortages and production delays, which in turn caused

inventory levels to shrink, order lead times to extend, and also resulted in cancelled customer orders and lost revenue.

45.     Even so, Ms. Cole remained committed to the business and the Company's staff, and advanced yet further funds to help the Company meet its short-term obligations.  By April 2020, however, with year-over-year revenues continuing to decline, that arrangement became unsustainable and the Debtors retained B. Riley to help source capital or identify a potential strategic transaction (including a sale of the Company or its assets).  B. Riley prepared extensive marketing materials and went to market to source opportunities, but it quickly became clear that the uncertainty of the pandemic at that time was creating a significant obstacle to attracting capital or an acceptable transaction partner.  Instead, B. Riley was able to successfully source the Gerber Facility in October 2020, which provided the Debtors with needed liquidity.

46.     With the effects of the pandemic lingering, even after the stores re-opened, the Debtors' business continued to suffer.  Sales continued to be slow, government mandated restrictions limited capacity, much of the Company's target demographic had temporarily relocated outside of New York City and the Debtors' had insufficient liquidity to pay vendors and acquire additional inventory.  In addition, given the Company's financial troubles, many of the Company's vendors forced advanced credit requirements on the Company, which further strained liquidity.  Despite these challenges, the Debtors worked diligently to maintain their operations in the face of declining liquidity and increasing financial uncertainty.

47.     While seeking a stable and long-term solution for the business, the Debtors engaged with, and extended exclusivity to, a potential strategic partner for a sale of the Company or its assets.  Ultimately, after almost eight months of negotiation and devoting considerable resources to the process, no transaction materialized.

### B.    Pursuit of Strategic Alternatives

48.    With the Company's financial distress deepening and the Debtors falling into default under the Gerber Facility, in July 2021 the Company once again retained B. Riley to help facilitate a capital solution.  Shortly thereafter, the Company also retained GT to help develop and execute on a strategic alternative with B. Riley.

49.    Accessing its considerable retail industry contacts, B. Riley targeted over 80 potential transaction parties likely to have an interest in pursuing a strategic transaction with the Company.  More than 20 prospective transaction parties entered into non-disclosure agreements and more than 10 parties conducted due diligence in the data room setup by B. Riley and the Company.  Several of those parties conducted substantial onsite diligence with Company representatives at 888 Broadway and engaged in advanced negotiations with the Company and its professionals.  Several parties also submitted either terms sheets or letters of intent to B. Riley and the Company.

50.    As discussions with several parties advanced, 888 Capital emerged as the frontrunner.  To solidify their intentions, 888 Capital purchased and took assignment of the Gerber Facility and agreed to make protective advances under the facility to fund the Company's operations to get to a sale transaction.  As negotiations progressed, 888 Capital expressed a desire to pursue a transaction under section 363 of the Bankruptcy Code and a willingness to provide DIP financing to help facilitate a chapter 11 filing.  On September 8, 2021, following weeks of arm's-length negotiations between the Company and 888 Capital, the parties entered into both a Stalking Horse APA and DIP Credit Agreement.

51.    Under the DIP Credit Agreement, 888 Capital has agreed to loan the Debtors over $6 million, subject to the DIP bid budget, various milestones and certain other conditions.

52.     The Stalking Horse APA provides for a sale of substantially all of the Debtors' assets to 888 Capital.  The purchase price will consist of an estimated $15 million credit bid plus $300,000 in cash and various assumed liabilities.  The Stalking Horse APA is subject to higher and better offers, and if other competing offers are received, the Debtors intend to conduct an auction for the sale of substantially all of their assets.

### C.     Debtors' Goals in These Chapter 11 Cases

53.     The Debtors have two immediate goals in these chapter 11 cases: (i) secure the use of cash collateral and DIP financing, and (ii) consummate a sale of their assets that will maximize recoveries for the Debtors' estates and maintain a viable business.  Immediate use of cash collateral and DIP financing on an interim basis will stabilize the business, avoid a wind-down of the business, and allow the Debtors to pay employees for any accrued and unpaid wages.  In the event the Debtors are unsuccessful in obtaining immediate use of cash collateral and DIP financing, the Debtors would be forced to liquidate.

54.     Unlike many other retail cases, the Debtors have not commenced this case to liquidate and shutter operations.  As set forth in their sale motion, based on the pre-petition marketing process, interest received from potential purchasers and the Stalking Horse APA from 888 Capital, the Debtors are seeking to pursue a sale of their assets on an expedited timeframe in order to limit administrative expenses and maximize value for the benefit of their stakeholders.

### V.     FIRST DAY MOTIONS

55.     As stated, the Debtors operate in a highly competitive industry.  It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' business.

Accordingly, the Debtors have filed a number of First Day Motions, a list of which is attached hereto as Exhibit A, designed to facilitate their transition into these chapter 11 cases. The Debtors anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider many of the First Day Motions.

56.     I have reviewed each of the First Day Motions with the Debtors' counsel, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and will be necessary and critical to the Debtors' ability to successfully execute a sale and restructuring is in the best interests of the Debtors' estates and creditors. For a more detailed description of the First Day Motions, I respectfully refer the Court to the respective First Day Motions.

57.     Several of the First Day Motions request authority to pay certain prepetition claims. I am told by the Debtors' advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and the Debtors' estates.

58.     I have reviewed each of the First Day Motions or had their contents explained to me. The facts stated therein are true and correct to the best of my information and belief. I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as contemplated by the relief requested in the First Day Motions. I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate

17

in chapter 11 with minimal disruption to their business operations and constitutes a critical element

in successfully executing a sale and restructuring.

## VI.    ADDITIONAL INFORMATION REQUIRED BY THE LOCAL RULES

59.    In accordance with Local Rule 1007-2, the schedules attached hereto provide

certain additional information related to the Debtors.

a.  Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any official committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

b.  Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders.

c.  Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto lists the holders of the five (5) largest secured claims against the Debtors on a consolidated basis.

d.  Pursuant to Local Rule 1007-2(a)(7), **Schedule 4** hereto provides the following information: the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of the Debtors that are held by the Debtors' directors and officers, and the amounts so held.

e.  Pursuant to Local Rule 1007-2(a)(8), **Schedule 5** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

f.  Pursuant to Local Rule 1007-2(a)(9), **Schedule 6** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

g.  Pursuant to Local Rule 1007-2(a)(10), **Schedule 7** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

h.  Pursuant to Local Rule 1007-2(a)(11), **Schedule 8** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

i.   Pursuant to Local Rule 1007-2(a)(12), **Schedule 9** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

j.   Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 10** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' Chapter 11 Cases as the Debtors intend to continue to operate their businesses.

k.   Pursuant to Local Rule 1007-2(b)(3), **Schedule 11** hereto provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

[*Remainder of this page intentionally left blank*]

## **CONCLUSION**

This declaration describes the factors that have precipitated the commencement of the Chapter 11 Cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.  I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 9th day of September, 2021                    _/s/ Aaron R. Rose_____
                                                                                         Aaron R. Rose

## Exhibit A – First Day Motions

1) Motion of Debtors for Entry of an Order Directing Joint Administration of the Related Chapter 11 Cases;

2) Motion of Debtors for Entry of Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs;

3) Motion of Debtors for Entry of an Order (A) Authorizing Debtors to File a Consolidated List of Creditors, (B) Authorizing Debtors to File a Consolidated List of Debtors' 30 Largest Unsecured Claims, and (C) Approving Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases;

4) Application of Debtors for Entry of an Order (I) Authorizing and Approving the Appointment of Stretto as Claims and Noticing Agent and (II) Granting Related Relief;

5) Motion of Debtors for Interim and Final Orders Authorizing, But Not Directing, Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Expenses and (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs, and for Related Relief;

6) Motion of Debtors for Authorization to Pay Certain Prepetition Taxes and Fees;

7) Motion of Debtors Requesting Authority to (I) Continue Using Existing Cash Management System, Bank Accounts, and Business Forms, (II) Implement Changes to the Cash Management System in the Ordinary Course of Business, (III) Continue Intercompany Transactions, (IV) Provide Administrative Expense Priority for Postpetition Intercompany Claims, and (V) for Related Relief;

8) Motion of Debtors for Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to (A) Continue to Maintain their Insurance Policies and Programs and Surety Bond Program, (B) Honor Certain Obligations with Respect Thereto, and (C) Pay Related Prepetition Obligations and (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Program;

9) Motion of Debtors (I) Requesting Authority to Honor Certain Prepetition Customer Obligations and (II) for Related Relief;

10) Motion of Debtors for (I) Authority to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) Section 503(B)(9) Claimants, and (C) Critical Vendors, and (II) Related Relief; and

11) Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors and Debtors In Possession to Obtain Superpriority Postpetition Financing, (B) Authorizing Use of Cash Collateral, (C) Granting Liens and Superpriority Claims, (D) Granting Adequate Protection to Prepetition Secured Party, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief.

**Schedule 1**

**Committee**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no official committee has been organized prior to the Petition Date.

## Schedule 2

### Consolidated List of 30 Largest Unsecured Claims (Excluding Insiders)

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of the Petition Date, the thirty (30) largest, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent or department | Nature of the claim | Amount of Claim | Contingent Unliquidated, Disputed or Partially Secured |
|---|---|---|---|---|---|
| 1. | Northern Trust | P.O. Box 75965 Chicago, IL 60675-5965 | Bank Debt | $15,545,648 | CUD |
| 2. | Mccreary Modern, Inc. | 53 Maple Avenue Morristown, NJ 07960 P: 828-464-6465 | Trade | $263,661.00 | CUD |
| 3. | Ashoka Creations | 19 Dashahera Kothi Govind Nager, Amer Road Jaipur, 302002, India P: 91-141-2631780 | Trade | $205,787.43 | CUD |
| 4. | Art Palace | Fattupur Mondh Road Bhadohi, 221401, India P: 915414227554 | Trade | $193,248.39 | CUD |
| 5. | DFC HD, Inc. | 138 Arthur Street Garden City, NY 11530-3002 P: 516-677-0350 | Trade | $174,229.00 | CUD |
| 6. | Step Halicilik | Tesvikiye Caddesi 101/2 Instanbul, 34365, Turkey P: 90-212-327-0050 | Trade | $169,167.97 | CUD |
| 7. | Presidio Networked Solutions Group | P.O. Box 677638 Dallas, TX 75267 P: 469-549-3800 | Trade | $152,705.00 | CUD |
| 8. | Meathway Contracting Inc. | 53-46 70th Street Maspeth, NY 11378 | Professional Services(Contractor Services) | $144,647.46 | CUD |
| 9. | Saberpoint, LLC | 300 East 55th Street Suite 4B New York, NY 10022 | Professional Services (IT Vendor) | $126,315.99 | CUD |
| 10. | Alam Rugs | Haneef Villa, Station Road Bhadohi 221 401 , Up, 221401 India P: 91 98390-80944 | Trade | $119,040.50 | CUD |
| 11. | Fried, Frank, Harris, Shriver & Jacobson LLP | One New York Plaza New York, NY 10004 Lee Parks P: 212-859-8000 lee.parks@friedfrank.com | Professional Services (Legal) | $102,184.40 | CUD |
| 12. | Anadol Rug Co | 1088 Huff Road Atlanta, GA 30318 P: 404-350-8558 | Trade | $101,944.99 | CUD |

| | | | | | |
|---|---|---|---|---|---|
| 13. | Meathway Contracting Inc. | 53-46 70th Street Maspeth, NY 11378 | Professional Services (Contractor) | $101,534.44 | CUD |
| 14. | Frette Inc. | 15 West 37th Street Suite 8th Floor New York, NY 10018 P: 212-299-0469 | Licensee | $98,574.99 | CUD |
| 15. | Ryder Last Mile Inc. | 75 Remittance Drive Dept. 6030 Chicago, IL 60675 | Professional Services (Delivery Services) & Rent | $98,209.80 | CUD |
| 16. | Rococo Rug Company Inc. | 888 Main Street Suite 845 New York, NY 10044 P: 212-933-1737 | Trade | $93,600.63 | CUD |
| 17. | Highmark Technical & Chiller Serv. | 49 West 45th St.6th Flr New York, NY 10036 | Professional Services (HVAC Maintenance) | $83,317.02 | CUD |
| 18. | Mobital Usa 3201 Jules-Brillant | Laval, QC H7P-6C9 Canada | Trade | $81,710.17 | CUD |
| 19. | American Express Trs | P.O. Box 1270 Newark, NJ 07101 P: 800-492-3932 | Credit Card Services | $79,316.00 | CUD |
| 20. | Lahore Carpets Mfg Co | Co 3.5 K.M. Defenco Road Off Raiwind Road Lahore, 53700 Pakistan P: 92427541280 | Trade | $78,428.27 | CUD |
| 21. | Saba Italia Srl Via Dell' IIndustria 17 | 35018 San Martino Di Lupari (Pd) San Martinodilupatri, 35018 Italy P: +39 049 5951767 | Trade | $78,185.00 | CUD |
| 22. | Taracea | 6619 South Dixie Highway #338 Miami, FL 33143 | Trade | 75,765.00 | CUD |
| 23. | Allstar Security & Consulting Inc. | 1441 Broadway, 17th Fl. New York, NY 10018 P: 212-616-7031 | Professional Services (Security Services) | $74,955.54 | CUD |
| 24. | Costikyan Workroom Inc. | 37-11 48th Avenue Long Island City, NY 11101 | Trade | $73,742.45 | CUD |
| 25. | Fabric Inc. | 10400 Ne 4th St, Ste 500 Bellevue, WA 98004 P: 425-298-3167 | Professional Services (E-commerce development) | $72,084.00 | CUD |
| 26. | Bilsa S.A. | Avenue Des Cerisiers, 15 1030 Bruxelles, 1030 Belgium P: 328365886 | Trade | $71,700.00 | CUD |
| 27. | Fenwick & West LLP | P.O. Box 742814 Los Angeles, CA 90074 P: 650-428-4422 | Trade | $66,932.64 | CUD |
| 28. | Rug And Kilim (Consign) Nazmiyal & Sons Inc | 25-18 40th Ave. Long Island City, NY 11101 P: 212-829-9995 | Trade | $66,399.38 | CUD |

| 29. | Bereket Halicilik Ltd. | Peykhane Cad. No. 46 Giris Kat Cemberlitas Istanbul Turkey | Trade | $64,303.17 | CUD |
|---|---|---|---|---|---|
| 30. | Mohawk Carpet Corp | Mohawk Factoring Inc 160 South Industrial Blvd. Calhoun, GA 30701 | Trade | $63,773.33 | CUD |

### Schedule 3

**Consolidated List of Holders of Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge, belief, and understanding, the following chart lists the creditors holding, as of the Petition Date, the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

| No. | Creditor | Complete mailing address, telephone number, and name of employee, agent or department | Collateral | Amount of Claim | Disputed? |
|---|---|---|---|---|---|
| 1. | 888 Capital Partners, LLC | 888 Capital Partners LLC<br>1350 Broadway<br>New York, New York 10018<br>Attention: Brian J. Beller, Esq.<br>Email: bbeller@tarterkrinsky.com | All assets, including inventory, accounts receivable and intellectual property, among other assets. | | No |

## Schedule 4

### Securities

Local Rule 1007-2(a)(7) requires the disclosure of shares of stock, debentures, and other securities ("**Securities**") of the Debtors that are publicly held.  There are no publicly held Securities.  Local Rule 1007-2(a)(7) also requires the disclosure of shares of Securities held by the Debtors' directors and officers as of the Petition Date, which the Debtors have listed out in the chart below.[4]

| Debtor | Name of Director/Officer | Approx. Number of Shares |
|---|---|---|
| A.B.C. Carpet Co., Inc. | Paulette Cole | 6.67% of Class A Common Stock; 36.0% of Class B Common Stock. |
| A.B.C. Home Furnishings, Inc. | Paulette Cole | .67% of Class A Common Stock; 99.0% of Class B Common Stock. |
| A.B.C. Oriental Carpets Inc. | Paulette Cole | 6.67% of Class A Common Stock; 36.0% of Class B Common Stock. |

---

[4]    Trusts maintained for the benefit of Ms. Cole or her daughter hold the remaining Securities of the Debtors not listed in the chart.

## Schedule 5

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgage, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including vendors, shippers, common carriers, materialmen, distributors, warehousemen, fulfillment houses, service providers, custodians, public officers, or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## **Schedule 6**

Pursuant to Local Rule 1007-2-(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Location | Address |
|---|---|
| abc carpet & home | 888 Broadway, New York, NY 10003 |
| LIC Warehouse | 14-08 28th Avenue, Long Island City, New York, New York 11102 |
| New Jersey Facility | 1115 West Middlesex Avenue, Port Reading, NJ 07064 |
| Brooklyn Store | 220 36th Street, Brooklyn, NY 11232 |

**<u>Schedule 7</u>**

**Location of Debtors' Assets, Books, and Records**

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets**

The Debtors' substantial assets are located in the locations specified in Schedule 6.

**Books and Records**

The Debtors' books and records are located at 888 Broadway, New York, NY 10003.

**Debtors' Assets Outside the United States**

The Debtors do not have assets located outside the territorial limits of the United States.

## **Schedule 8**

### **Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 9

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name | Title | Functions |
|------|-------|-----------|
| Aaron Rose | CEO | Oversee the creation and implementation of the Debtors' strategy and business plan. Lead initiatives to drive top line sales, expense control and profitability.<br><br>Oversee key business areas: Stores, E-Comm, Logistics, Marketing, Human Resources, Finance, IT, and Asset Protection. |
| David Lauber | CFO | Financial Strategy, Budgeting, Performance Analysis, Financial Reporting, Treasury, Accounting, Tax, Private Label Credit Card, and Payroll. |
| Manena Frazier | EVP Visual Merchandising/Visual Director | Store Sales and Profitability, Store Operations & Maintenance, Customer Service, Visual Merchandising. |

## Schedule 10

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| Payment to Employees (Not Including Officers, Directors, and Stockholders) | $1,094,000 |
| Payment to Officers, Stockholders, and Directors | $97,000 |
| Payments to Financial and Business Consultant | $1,088,000 |

Note: Payments to Financial and Business Consultants includes estimated Debtor, Creditor Committee, counsel, and other miscellaneous professional fees.

## Schedule 11

### Cash Receipts and Disbursements, Net Cash Gain
### or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, new cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $2,970,000 |
| **Cash Disbursements** | $5,008,000 |
| **Net Cash Loss** | $(2,038,000) |
| **Unpaid Obligations** | $1,000,00 |
| **Uncollected Receivables** | $400,000 |